UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:20-mj-5282 |
| | Toledo, Ohio |
|        Plaintiff, | |
|    vs. | **FRIDAY, SEPTEMBER 18, 2020** |
| RONALD E. GRAB, | |
|       Defendant. | |

TRANSCRIPT OF VIDEO DETENTION HEARING PROCEEDINGS
BEFORE THE HONORABLE JAMES R. KNEPP, II
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | **Michael J. Freeman**, |
| | *Assistant United States Attorney* |
| For the Defendant: | **Thomas P. Kurt, *Esquire*** |
| Also Present: | **Jordan Spadafore**, |
| | U.S. Pretrial Services |
| Official Court Reporter: | Stacey L. Kiprotich, RMR, CRR |
| | United States District Court |
| | 1716 Spielbusch Avenue, Suite 120 |
| | Toledo, Ohio 43604 |
| | (419) 213-5520 |

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1                           **I N D E X**

2                                                    **PAGE**

**Government's Witnesses**

3    Special Agent Sara Pedersen
         Direct Examination by Mr. Freeman:         8

4        Cross-examination by Mr. Kurt:            15
         Redirect Examination by Mr. Freeman:      20

5


6

**Defendant's Witnesses**

7    (None)
                                                    **PAGE**
8

Closing by Mr. Freeman:                            23

9    Closing Argument by Mr. Kurt:                 25
     Rebuttal by Mr. Freeman:                      27

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1　　　　　　　　　　**FRIDAY, SEPTEMBER 18, 2020**

2　　　　　　　　　　　　　　-　-　-

3　　　　　　　(Proceedings commenced at 9:30 a.m.)

4　　　　　　　　　　　　　　-　-　-

5　　　　　　　　(Discussion held off the record)

6　　　　　　　THE COURT:  Okay.  Well, let's go ahead and

7　get started then.

8　　　　　This is the United States of America versus Ronald E.

9　Grab.  It's Case Number 20-mj-5282.

09:35:23 10　　　　Mr. Grab was charged in a complaint with violations of

11　Title 18, United States Code, Section 922(o), possession of

12　a machine gun; and 26 U.S.C. Section 5861(d), possession of

13　an unregistered machine gun, or automatic weapon as the case

14　may be.

09:35:51 15　　　　Mr. Grab, when last we were together, I explained to

16　you how we were doing things by video here to protect

17　transports in and out of the courthouse primarily, and just

18　keeping people out of the same room where possible.  Same

19　deal here today.  This would ordinarily be taking place in

09:36:13 20　my courtroom, but we're sort of assembled in a video

21　courtroom here this morning with all the same people that

22　would be in my courtroom; they are witnessed here by video

23　conference.

24　　　　Let me just make sure, since we're on the record, you

09:36:28 25　can see and hear me okay, Mr. Grab.

4

1            THE DEFENDANT:  Yes, sir, I can.

2            THE COURT:  Okay.  If at any point that

3     becomes difficult because of a technological glitch or

4     whatever, just please let us know and we'll go back and fix

09:36:44  5     the problem and then fix your understanding.

6            With us here on the conference, we have Attorney

7     Thomas Kurt who is representing Mr. Grab.

8            We also have AUSA Freeman on behalf of the Government.

9     It appears that the case agent, Special Agent Pedersen, from

09:37:08 10     the FBI is with us here as well, the same way she would be

11     frankly as the case agent seated at counsel table, Mr. Grab,

12     if the case were proceeding in the courtroom.  She's here on

13     the video conference.

14            With that, the matter comes on for two things today.

09:37:31 15     First, is a preliminary hearing, and we talked about what a

16     preliminary hearing would be when we did your initial

17     appearance.  I guess it was earlier this week perhaps.  If

18     not, when was the complaint -- the complaint was filed on

19     the 14th, so I guess it was maybe Monday or Tuesday that we

09:37:52 20     did the initial appearance.  It was Monday probably.

21            Mr. Kurt, have you guys decided do we need to go ahead

22     with a preliminary hearing, or is that going to be waived?

23                MR. KURT:  Your Honor, I understand that Mr.

24     Grab is going to waive that hearing, and I've prepared the

09:38:12 25     form with his signature and I've emailed it to Jennifer.

1          THE COURT:  Okay.  So, Mr. Grab, you

2  understand that that's just a probable cause hearing and

3  that if you waive that, I send the matter to the Grand Jury?

4  If we have the hearing and I find probable cause again, I

09:38:26 5  send it to the Grand Jury.

6     Do you remember all of that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  And it is your desire here today

9  to waive your right to a preliminary hearing?

09:38:33 10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  Then I will renew my

12  probable cause determination, and I will bind the matter

13  over to the Grand Jury for its consideration.

14     The other matter of business that we needed to take up

09:38:46 15  this morning was the matter of the pretrial release of Mr.

16  Grab.  The Pretrial Services Office, in light of virtually

17  nonexistent criminal record of Mr. Grab and the nature of

18  the charges, has recommended that he be released on some

19  moderate, but not extensive, terms of supervision in the

09:39:13 20  grand scheme of things, pursuant to the Bail Reform Act.

21  The Government, nevertheless, moved for a detention and

22  asked for a continuance in order to be able to complete the

23  investigation of some preliminary matters.

24     Mr. Freeman, what is your position this morning with

09:39:30 25  regard to my following the recommendation of the Pretrial

1    Services Office?

2                MR. FREEMAN:  Yes, Your Honor.

3         The Government still is seeking detention at this

4    point in time.  We are prepared to have Special Agent

09:39:45  5    Pedersen testify to the facts that the Government believes

6    justifies a danger to the community.

7                THE COURT:  Okay.  Well, I think we better go

8    ahead and do that because you have the burden of proof here.

9    I'm assuming, Mr. Kurt, you guys don't want to just

09:40:04  10    rollover.  You want to have a hearing at this point; is that

11    correct?

12                MR. KURT:  Yes.

13                THE COURT:  Okay.  I don't blame you at all.

14         So, I guess, go ahead and proceed, Mr. Freeman.

09:40:17  15                MR. FREEMAN:  Your Honor, I'm happy to do so.

16    I was just curious, I have not been given any proposed

17    conditions as given by Mr. Grab to the Court, which is

18    customary, and I was wondering if that had been done.

19                THE COURT:  I don't think so, Mr. Freeman.  I

09:40:32  20    think they are just relying on they already got a favorable

21    recommendation from Pretrial Services.  So I don't want to

22    put words in Mr. Kurt's mouth, but if I were him, I would

23    rely on the terms and conditions, you know, put forth.

24                          -  -  -

25    (Court Reporter was disconnected from the video proceedings

1    and rejoined.)

2                    (Discussion held off the record)

3                              -   -   -

4                    (The following record was read:)

09:40:31   5         "THE COURT:  I don't think so, Mr. Freeman.  I

6    think they are just relying on they already got a favorable

7    recommendation from Pretrial Services.  So I don't want to

8    put words in Mr. Kurt's mouth, but if I were him, I would

9    rely on the terms and conditions, you know, put forth."

09:40:44  10                              -   -   -

11                   THE COURT:  Counsel, any objection to us

12   picking it up there, letting Mr. Freeman call Special Agent

13   Pedersen?  I will swear her again, and we can just sort

14   of -- I suspect I might have mumbled on a little bit more,

09:47:24  15   but I don't remember what I said, and I'm sure it wasn't

16   anything particularly pertinent anyway.  So are we okay with

17   that, Counsel?

18                   MR. KURT:  Yes, Your Honor.

19                   MR. FREEMAN:  Yes, Your Honor.

09:47:35  20                   THE COURT:  We're back on the record after a

21   technical glitch caused the court reporter to be

22   disconnected, and I was about to turn it over to Mr. Freeman

23   and ask him to call his first witness, please.

24                   MR. FREEMAN:  Thank you, Your Honor.  The

09:47:52  25   Government is seeking detention and would call Special Agent

**Special Agent Sara Pedersen (Direct)**

1    Sara Pedersen.

2              THE COURT:  Special Agent Pedersen, would you

3    please raise your right hand.

4                        -  -  -

09:48:02  5                   (Witness was sworn)

6                        -  -  -

7              THE COURT:  Okay.  And please say and spell

8    your full name for the record.

9              THE WITNESS:  Sara Pedersen.  S-a-r-a

09:48:10  10   P-e-d-e-r-s-e-n.

11             THE COURT:  And you are employed as a special

12   agent with the Federal Bureau of Investigation?

13             THE WITNESS:  Correct.

14             THE COURT:  Please proceed, Mr. Freeman.

09:48:26  15             MR. FREEMAN:  Thank you, Your Honor.

16        **DIRECT EXAMINATION OF SPECIAL AGENT SARA PEDERSEN**

17   **BY MR. FREEMAN:**

18   **Q**    And with that, you are assigned to the Toledo RA

19   office; is that correct?

09:48:31  20   **A**    Yes.

21   **Q**    What type of violations do you work as a special

22   with the FBI?

23   **A**    I investigate international and domestic terrorism.

24   Sometimes I will assist with criminal investigations.

09:48:47  25   **Q**    Just roughly, like what month and what year did FBI

**Special Agent Sara Pedersen (Direct)**

1    Toledo become aware of a potential target by the name of

2    Ronald Grab?

3    **A**    In July of 2020.

4    **Q**    And with that, what was the initial reporting in

09:49:04 5    regards to why the FBI should take a look at Mr. Grab?

6    **A**    We received information that Mr. Grab had attended a

7    militia training in Delta, Ohio, and at that training, he

8    had told people he grew castor bean plants, and then showed

9    them rounds from a firearm and had people look at the

09:49:30 10   rounds, and he said that he had ricin on the tips of those

11   rounds.

12   **Q**    In addition to that, was there any reporting about

13   types of weapons that may be illegal to possess?

14   **A**    There's a general belief in that militia group that

09:49:51 15   Mr. Grab owned a MAC-10 or a fully automatic weapon, and

16   there had also been comments that he had a lower or upper

17   receiver that was fully automatic.

18   **Q**    So once FBI Toledo open its investigation, did you

19   have the opportunity to review any communications among

09:50:20 20   militia members?

21   **A**    I did.

22   **Q**    And their principal means of communication was through

23   what type of application or what type of communication?

24   **A**    It was a social media application called Telegram.

09:50:40 25   **Q**    And just very generally, can you describe what

**Special Agent Sara Pedersen (Direct)**

1    Telegram is to the Court?

2    **A**    It's a group messaging application where members, if

3    you are in the group, you can chat with each other and see

4    what other people are posting.  So you can either write

09:50:59 5    something or post pictures.  I believe you can post videos

6    as well, but I'm not sure on that.

7    **Q**    Did you review any of those communications among the

8    group chat of the militia?

9    **A**    Yes, I did.

09:51:16 10    **Q**    Was there anything in there where Mr. Grab indicates

11    that he indeed has either ricin-filled bullets or poisonous

12    bullets?

13    **A**    Yes, he made a comment.  I will look at my notes here.

14    On or about, let's see, August 21st, Mr. Grab made a

09:51:40 15    comment -- well, the group was talking about loading

16    gunpowder into rounds so that it would not exit the enemy,

17    and Mr. Grab commented:  "Unless they are laced with castor

18    bean ricin, then you don't have to worry."

19    **Q**    Is there anything else within those group chats that

09:52:05 20    you reviewed that would be concerning about potential

21    proclivity to commit violence by Mr. Grab?

22    **A**    Other members were discussing Mr. Grab, and they did

23    comment that he has a mini MAC with poisoned bullets.

24    **Q**    Was there any discussion by Mr. Grab about who the

09:52:31 25    enemy was, or any frustration that would lead to violence?

**Special Agent Sara Pedersen (Direct)**

1  **A**    Yes.  Again, I will look at my notes here.  So on or

2  about August 30th, there was a group chat where Mr. Grab

3  made several comments.  Some of the comments are:  He

4  stated, "It's okay if they do it, but if we do it,

09:53:02  5  shot will hit the fan.  It seems to me it's against the law

6  to protect the country.  Firstly, I'm getting tired of it.

7  Don't you love being called a fascist and a Nazi, amongst

8  other things?  We need to send them a message that will echo

9  throughout the world, or at least this country, eye for an

09:53:24  10  eye."

11        A little bit later he wrote:  "Nobody cares about

12  being called a fascist Nazi, I guess, not while I shoot

13  back."

14        Then he wrote, "Sticks and stones may break your

09:53:37  15  bones, but a 5.56 will ruin their day."

16        A 5.56 is known as the caliber of a rifle round.

17        Another member wrote how he doesn't want them rioting

18  anymore, and he's referring to left-wing activists.

19        And Mr. Grab responded:  "I don't want them on the

09:53:59  20  same planet that I'm on.  They are useless garbage."

21        And then he wrote:  "Wouldn't bother me to shoot them

22  too."

23  **Q**    Okay.  As part of the investigation, did you zone in

24  on any property that Mr. Grab owned?

09:54:18  25  **A**    Yes.

**Special Agent Sara Pedersen (Direct)**

1    **Q**    And where is that?  In Delta, Ohio?

2    **A**    Yes.

3    **Q**    And did you seek a search warrant for that particular

4    location?

09:54:28  5    **A**    Yes, we did.

6    **Q**    Did you execute a search warrant of that particular

7    location as early as last week?

8    **A**    Yes.

9    **Q**    Can you describe for the Court, I would just say,

09:54:42  10    relevant or pertinent matters that were found upon his

11    property?

12    **A**    We did find several castor bean plants growing

13    throughout the yard.  We would estimate approximately 20 or

14    so plants.  We found what appeared to be castor bean seeds

09:55:05  15    and castor beans, and then they also -- he also had the seed

16    pods or the capsules.

17    **Q**    Did you find any literature in regards to castor bean

18    plants or ricin?

19    **A**    We did find a pamphlet that had been printed out on

09:55:34  20    castor beans and then a section was on ricin.

21    **Q**    Just generally, what was the information contained

22    within that pamphlet that was found within (inaudible) --

23              THE COURT REPORTER:  That was found within

24    what, Mike?

09:55:49  25              THE COURT:  Yeah, Mike, you cut out.

**Special Agent Sara Pedersen (Direct)**

1           MR. FREEMAN:  I'm sorry.  Within his

2      residence.

3           MR. KURT:  I missed that question.

4           THE COURT:  Would you ask the whole question

09:56:00  5      again, Mr. Freeman?

6           MR. FREEMAN:  Sure.

7      **Q**    Can you give a sense of the information on the

8      pamphlet about ricin that was found within his residence?

9      **A**    The pamphlet discussed that the ricin was dangerous

09:56:17 10      and was a poison and could affect animals and humans, very

11      generally.

12      **Q**    Did you find any bullets that appeared to have some

13      sort of substance within them?

14      **A**    Yes.  We found several bullets that had a substance in

09:56:35 15      them and they were sent to the lab.  I believe it was

16      approximately 36 rounds that we sent to the lab to be

17      analyzed.

18      **Q**    And that was sent to an FBI lab out of state; is that

19      correct?

09:56:49 20      **A**    Correct.

21      **Q**    Has the FBI been in communication with the lab

22      personnel to determine what indeed is in these bullets?

23      **A**    We have been in communication.  No official lab report

24      has been issued yet, but they did determine that the

09:57:07 25      substance is not ricin.

**Special Agent Sara Pedersen (Direct)**

1    **Q**    But is it fair to say that it is still outstanding

2    what the substance is and whether it's a derivative of

3    castor beans, even if it is not ricin at all?

4         Is it fair to say they don't have an answer of what's

09:57:28  5    in the substance?

6    **A**    Correct.  They do not know yet what the substance is.

7    **Q**    Beyond the castor bean plants, seeds, beans, were

8    there any other weapons or firearms found within the

9    residence?

09:57:42 10    **A**    Yes.  We seized 16 firearms, one of which was a lower

11    receiver to an AR-15 type weapon.

12    **Q**    Did he also have an upper for an AR-15 at his

13    residence?

14    **A**    Yes.

09:58:02 15    **Q**    As far as a search team, did not only FBI personnel,

16    but was there also Alcohol, Tobacco, Firearms and Explosive

17    personnel with you?

18    **A**    Yes.

19    **Q**    And did that ATF personnel review the lower receiver

09:58:19 20    that was found on the residence?

21    **A**    Yes, he did.

22    **Q**    Did he opine as to whether it was a semiautomatic or a

23    fully automatic weapon?

24    **A**    He conducted a function test and his belief was that

09:58:33 25    it was a fully automatic weapon.

**Special Agent Sara Pedersen (Cross)**

1  **Q**      Did he connect the lower receiver that was fully auto

2  to the upper that was found at the residence?

3  **A**      Yes, he did.

4  **Q**      Was there anything else found within his residence

09:58:53  5  that would be indicative of allegiance or beliefs to any

6  type of white supremacy or Nazi-like beliefs?

7  **A**      We did find a pin that looked like it may have been

8  part of a uniform at sometime and there was a Nazi swastika

9  on that pin.

09:59:17  10  **Q**      It is my understanding it is also kind of the German

11  war eagle with the Nazi symbol below it; is that correct?

12  **A**      Correct.

13  **Q**      It was at this point in time after the execution of

14  the search warrant that Mr. Grab was arrested?

09:59:33  15  **A**      Correct.

16          MR. FREEMAN:  I have nothing further at this

17  time for Special Agent Pedersen, Your Honor.

18          THE COURT:  Mr. Kurt.

19          MR. KURT:  Thank you.

09:59:51  20  **CROSS-EXAMINATION OF SPECIAL AGENT SARA PEDERSEN**

21  **BY MR. KURT:**

22  **Q**      Good morning, Agent.

23  **A**      Morning.

24  **Q**      Agent, you indicated in response to Mr. Freeman's

09:59:57  25  questions, he asked you whether anybody in this militia had

**Special Agent Sara Pedersen (Cross)**

1   made any statements that raised a specter of danger, and I

2   think that you indicated that Mr. Grab had indicated to some

3   of his militia -- fellow militia members about possessing a

4   weapon?

10:00:22 5   **A**    The mini MAC with poisoned bullets?  Are you

6   referencing that?

7   **Q**    Yeah.  So that didn't come from Mr. Grab's mouth, but

8   rather from his militia members?

9   **A**    Correct.

10:00:33 10  **Q**    Okay.  They said it was a general belief that he had

11  such a weapon?

12  **A**    Correct.

13  **Q**    What is a mini MAC?

14  **A**    It also can be referred to as an Uzi.

10:00:47 15  **Q**    Okay.

16  **A**    And it can be fully automatic -- this is just my

17  understanding.  I am not a firearms person.  My

18  understanding is they can -- mini MACs can be fully

19  automatic or semiautomatic depending on what type it is.

10:01:06 20  **Q**    Okay.  But you didn't have any statements made

21  directly by Mr. Grab that he had bullets with ricin in them;

22  correct?

23  **A**    We did have statements.

24  **Q**    By who?

10:01:20 25  **A**    By Mr. Grab.

17

**Special Agent Sara Pedersen (Cross)**

1    **Q**    Okay.  And those statements were from who?  Or how did

2    you come across --

3    **A**    Mr. Grab.

4    **Q**    I'm sorry.  When did you hear those statements?

10:01:32 5    **A**    Mr. Grab made statements on July 25th that he grew

6    castor beans and had ricin in the tips of his bullets or

7    rounds.

8    **Q**    Okay.

9                THE COURT:  I'm sorry.  May I interrupt?

10:01:46 10    Could you actually reference that statement?  Do you have it

11    there?  Could you reference what it is?

12                THE WITNESS:  Yes.

13                THE COURT:  Because I don't want you to put

14    words in his mouth, paraphrase.  I want you to tell me what

10:01:58 15    you believe he actually said on the post.

16                THE WITNESS:  Okay.  I just have to find it.

17                THE COURT:  Yeah.  That's okay.  But this is

18    pretty important I think.

19                MR. FREEMAN:  Your Honor, if I will, just

10:02:14 20    because I think there is a miscommunication happening here.

21        The July date that she's referencing is not a social

22    media post or group chat, it is actually an in-person

23    recorded conversation; so we do have quotes specifically

24    from Mr. Grab.  Later on, there is a group chat in which he

10:02:32 25    references it.  So there's two separate incidences where,

**Special Agent Sara Pedersen (Cross)**

1    from Mr. Grab, he references the ricin bullets.

2                    THE COURT:  Okay.  Are you okay with her

3    sharing that, Mr. Freeman?  I don't want to -- I don't --

4                    MR. FREEMAN:  I am, Your Honor.

10:02:48  5                    THE COURT:  I don't want to compromise a

6    source, you know, without you having adequate protection

7    placed here.

8          But if you could -- if Mr. Freeman isn't objecting to

9    my question, which I will let him do, if he wants to tell

10:03:02 10   you not to answer that question, but if you have a statement

11   attributed to Mr. Grab directly, I would like to hear it.

12                   MR. FREEMAN:  No objection, Your Honor.

13                   THE COURT:  Okay.

14   **A**    Okay.  So Mr. Grab, on July 25th, at the militia

10:03:24 15   training, stated:

16         "Did you ever hear of a castor bean?  That's the ricin

17   out of the castor beans, the ricin inside the hallow points.

18   I grow the castor bean plants, and that's -- you ever see

19   rounds like that?  I'm thinking if the kids in the

10:03:44 20   neighborhood see the plants growing, they're going to say,

21   'Man, we could smoke that just once, just once.'  And it's a

22   painful death because your body just slowly shuts down.  You

23   can put it on a little pin and just walk by someone and just

24   poke 'em.  But, you know, if I have to do something to

10:04:01 25   somebody like that, I don't care about them, I don't care."

**Special Agent Sara Pedersen (Cross)**

1    And I will note that Mr. Grab referred to ricin in

2    this, he called it "rose-in" instead of ricin.  But that was

3    also clarified by someone asking him basically, excuse my

4    language, "It's fucking ricin, right?"  And Mr. Grab

10:04:30  5    responded "Yeah."

6              THE COURT:  Okay.  Go ahead, Mr. Kurt.  I'm

7    sorry for the interruption there.

8    **Q**    So that was on July 25th?

9    **A**    Correct.

10:04:37  10   **Q**    And did you review audio of that statement?

11   **A**    I did.

12   **Q**    Okay.  How did you obtain audio of that statement?

13   **A**    I obtained it from another FBI office.

14   **Q**    Okay.  So Mr. Freeman also asked you if there were

10:04:57  15   literature or other things within Mr. Grab's residence that

16   concerned you concerning violence, and I think you said that

17   there was some statements made concerning his let's call it

18   antipathy towards rioters and so forth; is that correct?

19   **A**    Correct.

10:05:20  20   **Q**    Okay.  And this is not uncommon for people to make

21   comments of antipathy towards these rioters.  Would you

22   agree with me?

23   **A**    I couldn't really say.

24   **Q**    There was no statement made with respect to the

10:05:36  25   rioters, for example, that would lead to a criminal

1   investigation on its own; correct?

2   **A**    Well, if you only had a statement that was

3   non-threatening, that's not -- that would be First Amendment

4   protected speech.  We wouldn't investigate something like

10:05:54  5   that.

6   **Q**    Okay.  But in any event, despite what he may have said

7   on July 25th, you didn't find any ricin in his residence;

8   correct?

9   **A**    The test came back that it was not ricin.

10:06:10  10   **Q**    Okay.

11   **A**    So, correct.

12                  MR. KURT:  Okay.  No further questions.

13                  THE COURT:  Any redirect, Mr. Freeman?

14                  MR. FREEMAN:  Just one point of clarification,

10:06:25  15   Your Honor.

16          **REDIRECT EXAMINATION OF SPECIAL AGENT SARA PEDERSEN**

17   **BY MR. FREEMAN:**

18   **Q**    And you had touched upon this during direct

19   examination, but in addition to the recorded audio

10:06:33  20   statement, there was a statement attributed to Mr. Grab that

21   he wrote in the group chat where he, again, references

22   ricin; is that correct?

23   **A**    Yes.

24   **Q**    And specifically in the group chat, you had indicated

10:06:47  25   that someone was talking about loading gunpowder.  Can you

**Special Agent Sara Pedersen (Redirect)**

1    go over that statement again just so it's clear for the

2    Court?  I mean, what statement comes specifically from Mr.

3    Grab?

4    **A**    Okay.  So this was on a conversation that occurred on

10:07:01  5    or about August 21st, and the militia members were

6    stating -- one militia member was stating that he was

7    loading gunpowder into rounds, and was hoping that his

8    rounds would not exit the enemy.  And so in response to

9    that, Mr. Grab wrote:  "Unless they are laced with castor

10:07:24 10   bean ricin, then you don't have to worry."

11           MR. KURT:  Okay.  Thank you.  I have nothing

12   further, Your Honor.

13           THE COURT:  Okay.  Thank you, Special Agent

14   Pedersen.

10:07:39 15      Mr. Freeman, any further witnesses.

16           MR. FREEMAN:  No, Your Honor.

17           THE COURT:  Or any further -- and you can

18   proffer.  You know, I should have explained to everyone, at

19   a detention hearing, just so the record is clear, the

10:07:58 20   Government, under this circumstance, I believe, has the

21   burden of proof of establishing that there are no available

22   terms and conditions or combination of terms and conditions

23   which can satisfy two considerations.

24       The first consideration is the future appearance of

10:08:21 25   Mr. Grab, the defendant.  The Government has a burden of

1   proof by a preponderance of the evidence on that question,

2   which is a simple 51 percent, more than half, situation.

3       As to the other consideration, the other factor, which

4   is whether there are available terms and conditions which

10:08:44 5   can reasonably assure the safety of other persons and the

6   community, the Government has a higher standard, and that is

7   by what's called clear and convincing evidence, which is a

8   higher standard than a preponderance.  It's not all the way

9   to proof beyond a reasonable doubt or anything like that,

10:09:04 10  but it's higher than a preponderance.

11      The rules of evidence don't apply here today.  So, for

12  example, Mr. Freeman was free to proffer any statements he

13  wanted.  Special Agent Pedersen was able to testify without

14  concern about hearsay and things like that, which would not

10:09:23 15  be the case in a trial; but here in this particular

16  proceeding today, that's all fair game.

17      I will give you a chance to make argument, Mr.

18  Freeman.

19      Mr. Kurt, do you have any witnesses you wish to call

10:09:40 20  this morning?

21          MR. KURT:  I do not, Your Honor.

22          THE COURT:  Or any evidence you want to

23  proffer even?

24          MR. KURT:  No.

10:09:46 25          THE COURT:  Okay.  Then, Mr. Freeman, I will

**Closing (Government)**

1    listen to argument from you about why you believe that -- I

2    suspect you are going to be concentrating on safety of other

3    persons and the community, and how you believe you've

4    established under the 3142 factors that there are not

10:10:06  5    available terms and conditions before us here this morning

6    which could address those concerns.

7                    MR. FREEMAN:  Thank you, Your Honor.  You are

8    correct, the Government is not making a risk of flight

9    concern for the Court for its detention purposes.

10:10:22 10        The Government does believe that we have carried our

11    burden by clear and convincing evidence that he is a danger

12    to the community and that there are no terms and conditions

13    that could minimize that.

14        Specifically, as you heard from Special Agent, Mr.

10:10:36 15    Grab is part of a militia group which is protected, however,

16    what is not protected is actual planned violence or

17    preparing for violence.

18        In this particular case, Mr. Grab himself discussed

19    who he believed the enemy were to be.  He called them "I

10:10:55 20    don't want them on the same planet as me.  They are useless

21    garbage," and he said it wouldn't bother him to shoot them.

22        So I think if you look at it from that perspective, he

23    then also shows other militia members rounds that he is

24    representing to be ricin, both in person and on the group

10:11:13 25    chat.

**Closing (Government)**

1    We did find bullets in his house, approximately 36, as

2    testified, that had some substance in it.  We do not know

3    what that substance is.  It is not ricin.  However, that

4    does not minimize the fact that maybe he was potentially

10:11:31  5    trying to make ricin.  And where you get that from is he has

6    20 to 25 castor bean plants, he has castor bean seeds, he

7    has the beans themselves.  He has many of the materials

8    necessary in order to make ricin.  The fact that he may have

9    ultimately been a bad ricin maker I don't think minimizes

10:11:52  10    his dangerousness to the community.  Coupled with that, not

11    only do we have someone who is talking about his enemy and

12    wanting to shoot other people, other Americans, we have

13    someone who is growing castor bean plants.  He also has a

14    fully automatic weapon, a machine gun.

10:12:09  15    And I think that in totality, when you look at those

16    factors -- and particularly he references even he doesn't

17    mind being called a Nazi and a fascist, well, lo and behold

18    in his house he has Nazi paraphernalia in his house with the

19    German war eagle and the Nazi emblem behind it.

10:12:32  20    So if you look at his affiliation with this militia,

21    he discusses specifically committing acts of violence.  At

22    his house, he has many of the materials to actually make a

23    biological weapon.  He actually then takes the time to fill

24    some substance into 36 rounds and then goes around and

10:12:51  25    represents to the fact that these are poisonous bullets, all

**Closing (Defense)**

1    while having an unlawful machine gun.  So I think if you

2    look at the totality of those things, he is a danger to the

3    community.

4        The only aspect is is his age of being a significant

10:13:06  5    fact of why he is not a danger to the community.  I would

6    just highlight to the Court, like the Las Vegas shooter that

7    used a bump-stock to convert a weapon to a machine gun was

8    in his mid 60s, and, therefore, that fact alone does not

9    diminish the fact of the dangerousness he is to community.

10:13:26  10    Obviously, at his age, over 70 years old, he is still

11    talking and going to training and growing castor beans; and,

12    therefore, his age alone does not overcome the rest of the

13    evidence that shows that he is a serious danger to the

14    community.

10:13:41  15            THE COURT:  Mr. Kurt.

16            MR. KURT:  Your Honor, Mr. Freeman refers to

17    Mr. Grab having many of the materials needed to convert

18    castor beans to ricin.  There is no evidence at all of that.

19    The plants are there, the seeds were there, but there's

10:13:57  20    certainly no evidence of any chemicals or any materials that

21    would be necessary to make that conversion.  I'm not even

22    sure how it is made.  My understanding is that it's a fairly

23    complicated chemical procedure.  He didn't even have

24    directions how to do that.  What he had was a pamphlet that

10:14:15  25    emphasized the danger of the beans.  The castor plant is

**Closing (Defense)**

1    used by many people ornamentally, including Mr. Grab.  It's

2    in his yard for everybody to see.  So it's not -- it doesn't

3    strike me as unusual that he would have a pamphlet that

4    would put him on notice of the danger of the plant.

10:14:32  5    What we have here is obviously a lot of empty talk

6    among these militia members.  Clearly, if he told militia

7    members that he had rounds with ricin in them, he was

8    bragging, and bragging without basis and fact, because in

9    fact these rounds did not have ricin in them.  We've heard

10:14:52 10   that from the agent and Mr. Freeman.

11   I want to take issue with something else.  Mr. Grab

12   did not say -- according to the agent's testimony, Mr. Grab

13   did not proudly wear the mantle of a fascist or a Nazi.  I

14   believe she said the he objected to people calling him that,

10:15:11 15  and there's nothing wrong with him saying that.  I think

16   that puts him in a different light.

17   The last time we met, the quote, unquote, "elephant in

18   the room" was whether there was actual ricin in these rounds

19   or in Mr. Grab's possession.  There is not.  He is charged

10:15:28 20  with possession of an automatic weapon and that's it.

21   The statements that he made to the militia members I

22   don't think amount to direct threats to anybody.  If he said

23   he didn't mind some people getting shot that were rioters,

24   I'm not going to give a personal opinion of that, but it's

10:15:49 25  not a threat.  It is not a direct threat to shoot anybody,

**Rebuttal (Government)**

1  and we haven't had evidence that he was or is planning to

2  harm anybody.  And I don't think the Government's carried

3  its burden of showing that he's of such danger to the public

4  that he can't be released.

10:16:02  5          THE COURT:  Thank you.

6      Any rebuttal, Mr. Freeman?

7          MR. FREEMAN:  Just one point.  In terms of the

8  rioters in that statement, he concludes that statement then

9  "It wouldn't bother me to shoot them too," an actual act of

10:16:19 10  Mr. Grab talking about shooting the rioters, not others.

11  But we rely on my previous argument, Your Honor.

12          THE COURT:  Okay.  So this is a tough case

13  because I do agree that a lot of the conduct that Mr. Grab

14  was engaged in is protected by the First Amendment.  I, to

10:16:43 15  my core, believe in free speech and the ability to say

16  things and protest, frankly peacefully, to maybe even spout

17  off a little bit.

18      The problem here for me -- and, again, I'm a gun owner

19  and I believe in the Second Amendment also to my core.  I

10:17:09 20  think it's every bit as important as other amendments.  The

21  problem here is I've got a combination of some speech that

22  probably crosses over the line in terms -- from commenting

23  about things into threats; and then you back that up with

24  possession of an illegal weapon, meaning the machine gun

10:17:36 25  lower, or this fully automatic lower anyway, I don't

1    (inaudible) word machine gun, but fully automatic.

2         And there are lots of rounds of ammunition in my

3    possession, and none of them have any substances loaded into

4    them.

10:17:51  5         I have to believe that Mr. Grab either thought it was

6    something toxic, or it is something toxic.  There is no

7    reason to be loading substances into bullets unless you

8    think it is making them particularly lethal in a way that

9    would not be consistent with my understanding of our rights

10:18:19 10   to possess firearms and ammunition.

11         So I'm going to find that the Government has carried

12    the burden here.  Admittedly, it's barely clear and

13    convincing, but it is clear and convincing that this

14    combination of what he was saying and what they found with

10:18:37 15   the search warrant.

16         And I also note that he's not charged with anything

17    other than possessing a machine gun, two different charges

18    based on frankly the same weapon.

19         I'm a little troubled by the fact that the Government

10:18:55 20   is asking me to detain him based on conduct that they don't

21    feel strongly enough about to charge him with, but I also

22    observe that they are not held to the same standard in terms

23    of bringing that evidence to me.  They would have to in good

24    conscience believe they could prove by proof beyond a

10:19:20 25   reasonable doubt in order to charge Mr. Grab with any of

1    those other things related to the castor beans and ricin,

2    and it's a lower standard here in terms of using that

3    evidence to demonstrate dangerousness to the community.

4         So I take -- I certainly am sympathetic to the

10:19:44 5    argument that you are making here, Mr. Kurt, and I believe

6    participation in a militia is protected.  I believe in free

7    speech.  But when you cross over the line and back it up

8    with having an illegal weapon in your possession, at that

9    point, the world kind of comes crashing down on you a little

10:20:02 10   bit in terms of my observation of dangerousness.  So I'm

11   going to find that they have met their burden.

12        I will issue a written order either today or Monday,

13   but I'm just telling you that's what it's going to say.

14        You have a right to take an appeal, Mr. Kurt.  That

10:20:21 15   appeal would be to one of the District Judges.  It would be

16   randomly assigned because the case has not been indicted, so

17   there is no District Judge on the case, but I don't want you

18   to think that you don't have an avenue to appeal my

19   decision, if you believe there is a basis for it.  You could

10:20:40 20   get a de novo review from one of the District Judges if you

21   do that.  So that is going to be my order.

22        And with that, we will be adjourned.

23             MR. KURT:  Thank you, Your Honor.

24             (Proceedings concluded at 10:20 a.m.)

25                        -  -  -

1

## C E R T I F I C A T E

2

    I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled matter

3

prepared from my stenotype notes.

4

        */s/ Stacey L. Kiprotich*       *09/30/2020*
        STACEY L. KIPROTICH, RMR, CRR      DATE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25